UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 4:09CR678 CDP |
| TONY MARTIN, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). The Defendant filed a motion to suppress the fruits of an unconstitutional stop. A hearing on the motion was held on January 11, 2010, and on January 21, 2010, the court reporter filed the written transcript of the proceedings.

Based upon the evidence adduced at the hearing on the motion to suppress as well as a review of the transcript of the hearing in this matter, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

John Applegate is a sergeant with the Metropolitan St. Louis Police Department. He is currently assigned to the violent crimes unit, which is a task force in which the St. Louis police department works together with the Bureau of Alcohol, Tobacco and Firearms ("ATF"). During the first week of October, 2009, ATF Agent Michael Ramos received information from a documented ATF informant who told him that a person he knows as Tony Martin, who also uses the name "Pretty Boy," was in possession of a firearm. He stated that he observed "Pretty Boy" to be in possession

of a firearm during the week of October 5, 2009, and that "Pretty Boy" had been convicted of murder on a prior occasion. The informant had previously provided information to the ATF Task Force (of which Sgt. Applegate was a member), and the informant's information led to several arrests and convictions on narcotics and weapons charges in federal court. The informant provided the information to Ramos both on the telephone and in person. After receiving this information, Sgt. Applegate conducted an investigation using law enforcement computers in an effort to verify the information given by the informant. Applegate discovered that an individual by the name of Tony Martin was convicted of second degree murder, sentenced to the Missouri Penitentiary, and was currently on parole for this second degree murder charge. He also determined that Martin used the alias name "Pretty Boy." Sgt. Applegate obtained a photograph of Tony Martin from the law enforcement files, and this photograph was shown to the confidential informant. The informant positively identified the photograph of Tony Martin as the person who he observed with the gun, and who had been convicted of murder.

On October 16, 2009, the confidential informant again contacted Ramos. The informant advised Ramos that Martin was in possession of a firearm on that day, and was carrying a gun because his girlfriend's son had been the victim of a murder earlier that morning at 5717 Robin in the City of St. Louis. The informant told Ramos that Martin was carrying the gun so he could retaliate against those people he believed killed his girlfriend's son. Applegate and his Task Force were already aware that a homicide occurred at 5717 Robin at 4 a.m. on that morning.

Later on in the day, the confidential informant again contacted Ramos, and said that Martin was, at that time, located at a lot at Walton and McMillan Streets in the City of St. Louis. He told Ramos that Martin was in possession of a handgun, and gave Ramos and members of the Task Force

a description of the clothing Martin was wearing. Applegate was familiar with the lot at the corner of Walton and McMillan because it was the scene of ongoing narcotics activity. After receiving this information, Applegate, Ramos, and other members of the Task Force went to the vicinity of Walton and McMillan Streets, and observed Martin to be at that location wearing the clothing described by the confidential informant. They observed the Defendant enter a black Mercury Marquis with two other individuals, with the Defendant entering the front seat passenger side of the vehicle. The vehicle left the scene, and members of the Task Force followed the vehicle to the intersection of Baird and Page Avenues, where the vehicle was curbed by police authorities. Applegate and other officers approached the passenger side window of the car with their weapons drawn and ordered Martin and the other individuals to exit the vehicle. As soon as Martin exited the vehicle, he was handcuffed and an ATF agent patted down the outside of Martin's clothing in Applegate's presence. When the ATF agent told Applegate that he felt a hard object that he believed to be a gun, Applegate retrieved a .380 caliber semi-automatic handgun from the Defendant's coat pocket. Shortly after retrieving the firearm, the Defendant made statements about the firearm that were not in response to any questions or solicitation by Applegate or any other agents.

**Conclusions of Law**

A. The Arrest of the Defendant

Based on the above, the undersigned concludes that the Defendant was lawfully arrested and searched incident to a lawful arrest. Initially, the undersigned concludes that the fact that the officers may have intended to initially detain the Defendant before arresting him is not controlling as to the issue of whether the officers possessed probable cause to arrest at the time of the stop. As to this issue, the Court stated as follows in United States v. Abadia, 949 F.2d 956 (8th Cir. 1991):

("Because probable cause for an arrest is determined by objective facts, it is immaterial that [the arresting officer] ... testified that he did not think he had 'enough facts' upon which to [make an] arrest....") . . .

949 F.2d 956, 959 n. 14.

Because the undersigned concludes that, based on the totality of the circumstances, there were very strong "objective facts" to justify probable cause, the arrest of the Defendant and his search incident to the arrest was lawful.

Police officers may arrest persons without a warrant if they have probable cause to believe that the person arrested has committed a crime. Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964). Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context--not readily or even usefully reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). In the context of a warrantless arrest, all that need be shown is a "fair probability" that a crime has been committed and the defendant committed the crime. See Illinois v. Gates, supra.

Further, the uncorroborated work of a reliable informant, without more, is sufficient to provide probable cause for the issuance of an arrest warrant. As the Court stated in United States v. Pressley, 978 F.2d 1026 (8th Cir. 1992):

> It is well settled that the statements of a reliable informant can provide, by themselves, a sufficient basis for the issuance of a warrant.

978 F.2d 1026, 1027. See also, United States v. Sherrill, 27 F.3d 344 (8th Cir. 1994).

In a case very similar to the one now at bar, the Supreme Court held that information that a defendant would be transporting heroin at a particular place at a particular time, corroborated by the defendant showing up at that place and time is sufficient to support probable cause for the arrest of

the defendant, if the information was obtained from a reliable informant. In United States v. Draper, 358 U.S. 307 (1959), the Court outlined the facts in the case as follows:

> The evidence offered at the hearing on the motion to suppress. . .established that one Marsh, a federal narcotic agent with 29 years' experience, was stationed at Denver; that one Hereford had been engaged as a "special employee" of the Bureau of Narcotics at Denver for about six months, and from time to time gave information to Marsh regarding violations of the narcotic laws, for which Hereford was paid small sums of money, and that Marsh had always found the information given by Hereford to be accurate and reliable. On September 3, 1956, Hereford told Marsh that James Draper (petitioner) recently had taken up abode at a stated address in Denver and "was peddling narcotics to several addicts" in that city. Four days later, on September 7, Hereford told Marsh "that Draper had gone to Chicago the day before [September 6] by train [and] that he was going to bring back three ounces of heroin [and] that he would return to Denver either on the morning of the 8th of September or the morning of the 9th of September also by train." Hereford also gave Marsh a detailed physical description of Draper and of the clothing he was wearing, and said that he would be carrying "a tan zipper bag," and that habitually "walked real fast."
>
> . . .Repeating the process on the morning of September 9, they [the officers] saw a person, having the exact physical attributes and wearing the precise clothing described by Hereford, alight from an incoming Chicago train and start walking "fast" toward the exit. He was carrying a tan zipper bag in his right hand and the left was thrust in his raincoat pocket. Marsh, accompanied by the police officer, overtook, stopped and arrested him. They then searched him and found the two "enveloped containing heroin" clutched in his left hand in his raincoat pocket, and found the syringe in the tan zipper bag. Marsh then took him (petitioner) into custody. Hereford died four days after the arrest and therefore did not testify at the hearing on the motion.

358 U.S. 307, 309, 310.

In holding that the above information provided ample probable cause for the arrest of the defendant and the search of his person, the Court stated as follows:

> Nor can we agree with petitioner's second contention that Marsh's information was insufficient to show probable cause and reasonable grounds to believe that petitioner had violated or was violating the narcotic laws and to justify his arrest without a warrant. The information given to narcotic agent Marsh by "special employee" Hereford may have been hearsay to Marsh, but coming from one employed for that purpose and whose information had always been found accurate and reliable, it is clear that Marsh would have been derelict in his duties had he not pursued it. And when, in pursuing that information, he saw a man, having the exact physical attributes

5

and wearing the precise clothing and carrying the tan zipper bag that Hereford had described, alight from one of the very trains from the very place stated by Hereford and start to walk at a "fast" pace toward the station exit, Marsh had personally verified every facet of the information given him by Hereford except whether the petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag. And surely, with every other bit of Hereford's information being thus personally verified, Marsh had "reasonable grounds" to believe that the remaining unverified bit of Hereford's information--that Draper would have the heroin with him--was likewise true.

. . .

We believe that, under the facts and circumstances here, Marsh had probable cause and reasonable grounds to believe that petitioner was committing a violation of the laws of the United States relating to narcotic drugs at the time he arrested him. The arrest was therefore lawful, and the subsequent search and seizure, having been made incident to that lawful arrest, were likewise valid. It follows that petitioner's motion to suppress was properly denied and that the seized heroin was competent evidence lawfully received at the trial.

358 U.S. 307, 313, 314.

Based on the above, the undersigned concludes that, in the case now at bar, there was ample probable cause to arrest the Defendant. The information of the informant, who was a documented ATF informant, had proven reliable in the past, and led to the arrest and conviction of individuals in federal court for firearms and narcotics violations. In addition, the informant gave specific detailed information as to the Defendant, including the Defendant's name, his alias, and the fact that the Defendant had been recently released from the Missouri state penitentiary on a murder charge. Every bit of this information was corroborated by Applegate and the other agents working with him. The Defendant used the alias of "Pretty Boy" and had been recently released from the Missouri state penitentiary on parole for second degree murder. In addition, a photograph of the Defendant was shown to the informant, and the informant identified the photograph of the Defendant as the person who was known to him as "Pretty Boy." In addition, on the morning of the arrest, the informant

contacted the agents and told them that the Defendant would be carrying a firearm on that date, and that he would be carrying the firearm because his girlfriend's son had been murdered at an address on Robin in the City of St. Louis in the early morning hours of that date. In fact, the police officers and agents were aware that a murder had taken place at 4 a.m. on Robin in the City of St. Louis on the date the informant called the officers. Later on in the day, the informant again contacted the officers and told the officers that the Defendant was then in possession of a firearm, at a specific intersection on a lot in the City of St. Louis, and described what the Defendant would be wearing at that time and place. When the agents arrived at that location, they observed the Defendant and two other individuals on the lot. They observed that the Defendant was dressed in the manner that the informant described. Thus, they were able to corroborate the exact details of their reliable informant's information.

The above being the case, the undersigned concludes that, as in Draper, supra, the agents possessed ample information which they corroborated from a reliable informant and, thus, could arrest the Defendant at that time and place for unlawful possession of a weapon. When they did so, the undersigned concludes that the arrest was lawful, and that, therefore, the search of the Defendant's person and the discovery of the firearm was also lawful. Therefore, the evidence should not be suppressed.

Alternatively, the undersigned concludes that there was reasonable suspicion to detain the Defendant and to conduct a limited pat down search for weapons. See Terry v. Ohio, 392 U.S. 1 (1968). The rationale of Terry v. Ohio is delineated in the case of United States v. Hernandez-Hernandez, 327 F.3d 703 (8th Cir. 2003). In so delineating, the Court states as follows:

> . . .If officers possess a reasonable suspicion of criminal activity, they may briefly detain a suspect to investigate the possible criminal activity, even though there is no

7

probable cause for an actual arrest. Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868 20 L.Ed.2d 889 (1968). If the officer also reasonably believes that the person may be armed and dangerous, the officer may frisk the suspect for weapons. Id. at 24, 88 S.Ct. 1868. The detention is permissible to determine the suspect's identity or to maintain the status quo while obtaining more information. Adams v. Williams, 407 U.S. 143 (1972). The officer may ask "'a moderate number of questions to determine the person's identity and try to obtain information confirming or dispelling the officer's suspicion.'" . . .The officer's suspicion is reasonable if the officer knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed. . .

In Hernandez-Hernandez, officers received information that the defendant was in possession of firearms and drugs. In holding that a pat down search of an individual was justified based on this information, the Court stated as follows:

> Hernandez-Hernandez contends that even if he was not arrested until after the officers learned of his illegal presence in the country, the investigative detention and patdown were illegal because the officers lacked the necessary reasonable suspicion that Hernandez-Hernandez was engaged in criminal activity and that he was armed and dangerous. We disagree. Two independent eyewitness sources, including one known source in custody who had conducted drug business with Hernandez-Hernandez, provided information that Hernandez-Hernandez had many firearms and was dealing drugs from his home. They described Hernandez-Hernandez and predicted he would be standing outside his house. An undercover officer drove by the residence and confirmed this information. Hernandez-Hernandez asserts police should have done more to corroborate the tips, but does not directly challenge the sources' veracity, reliability, or basis of knowledge. . .Considering the totality of the circumstances, Hernandez-Hernandez's contention fails because the officers had reasonable suspicion of criminal drug activity allowing them briefly to detain Hernandez-Hernandez to determine his identity and maintain the status quo pending the outcome of the search. . .

327 F.3d 703, 706, 707.

Further, reliable information from an informant or from a citizen may be enough to justify the stop and pat down search of an individual. See Alabama v. White, 496 U.S. 325 (1990); Adams v. Williams, 407 U.S. 143 (1972). In addition, the fact that the Defendant was placed in handcuffs when arrested does not render the stop an arrest under the circumstances where it was likely the Defendant

8

possessed a loaded firearm and was on parole for murder. See United States v. Fornia-Castillo, 408 F.3d 52 (1st Cir. 2005); United States v. Maltais, 403 F.3d 550 (8th Cir. 2005). Based on the above, the undersigned concludes that the officers had specific information corroborated by them from a reliable informant that the Defendant possessed a weapon at the time and place they confronted him; that he was dangerous because he possessed a weapon in order to retaliate for a murder, and that he was a convicted murderer. Therefore, the pat down search was justified under Terry v. Ohio as well as based on probable cause to arrest, and a search incident to arrest. Therefore, the motion to suppress should be denied on this separate ground.

B. Spontaneous Statement of the Defendant

Further, the undersigned concludes that the Defendant made a statement shortly after he was placed in handcuffs, not in response to any questioning or threats by the police officers. The undersigned concludes this was a spontaneous voluntary statement and should not be suppressed. See Rhode Island v. Innis, 446 U.S. 291 (1980).

**Conclusion**

Therefore, the undersigned concludes that the motion to suppress should be denied.

* * *

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress the Fruits of an Unconstitutional Stop [Doc. #22] be **denied**.

Finally, the parties are advised that they have fourteen (14) days, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


                <u>/s/ Terry I. Adelman</u>
                UNITED STATES MAGISTRATE JUDGE

Dated this <u>23rd</u> day of February, 2010.